Filed 7/14/16  P. v. Murphy CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GEOFF MURPHY,<br><br>    Defendant and Appellant. | F069891<br><br>(Super. Ct. No. BF150423A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Charles M. Bonneau, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and Kevin L. Quade, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Geoff Murphy was convicted by a jury on charges of elder abuse, making criminal threats, and first degree murder.  The trial evidence showed that Murphy fired a bullet

into his father's head at point-blank range. He was sentenced to an indeterminate term of life in prison with a minimum incarceration period of 53 years and eight months.

The unusual facts of this case involve an altercation between a 74-year-old man and his son, the then 33-year-old appellant, who by all accounts was suffering from mental health problems at the time of the incident. Appellant had been verbally abusive toward his mother, culminating in threats of bodily harm, and his father reacted by pulling out a pistol and shooting appellant in the chest. Appellant grappled with his father and succeeded in disarming him. He was able to subdue the older man, but proceeded to beat him about the face and body before ending his life with a single gunshot. The jury found the killing to be unmitigated and premeditated, rejecting appellant's self-defense argument and his claim that the symptoms of a well-documented mental disorder precluded him from forming the requisite intent for murder.

Appellant's contentions on appeal include three claims of instructional error, all of which have been forfeited due to the absence of a timely objection. Appellant failed to raise any issues concerning the instructions he now challenges, and relied on some of those instructions to help explain his theory of the case to the jury. There is also a claim regarding the trial court's decision to strike a small portion of expert witness testimony, and, lastly, challenges to the sufficiency of the evidence supporting the verdict. Appellant's arguments lack merit, which is not to say we share the jury's interpretation of the evidence, but only that the evidence is legally adequate to support the convictions. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant is the son of James and Barbara Murphy. He grew up in Bakersfield, took some college courses there after graduating from high school, and served in the United States Army from 2003 to 2005 before receiving a general discharge under "other than honorable" conditions. He later sought treatment for alcohol dependency, married a woman whom he met through Alcoholics Anonymous, and relocated to Vallejo. In early

2009, appellant experienced what is described in the record as a significant "psychotic episode" and was hospitalized for mental health care. He thereafter received psychiatric treatment on a regular basis from March 2009 through June 2013.

In July 2013, after separating from his wife, appellant moved back to Kern County to live with his parents. According to Barbara Murphy, appellant showed signs of depression during the initial weeks of his stay, e.g., crying and expressing regret for having wasted much of his adult life. With the exception of a one-month stint working as a security guard at an amusement park, he had spent the past several years unemployed and living off of his wife's disability income.

On July 16, 2013, appellant's father took him to a mental health facility in Bakersfield known as the Mary K. Shell Center. The purpose of this visit was to find a local doctor who could prescribe medication for appellant's psychiatric conditions. Appellant returned to the same facility on July 30, 2013, but it is unclear from the record what services he received on that date, if any. A former roommate in Vallejo told Barbara Murphy that appellant had obtained a month's supply of medication before leaving for Bakersfield, but Mrs. Murphy was not aware of him taking any psychotropic medicine while he was living with her that summer.

Appellant's depression improved toward the end of July, but the change coincided with new patterns of delusional and paranoid behavior. He claimed that the Department of Homeland Security was recruiting him for an analyst position and had offered him a $25,000 signing bonus to accept the job. Appellant also believed the government was monitoring him through cameras and by aerial surveillance.

On July 30, 2013, shortly before midnight, James Murphy made a 911 call for police assistance due to appellant's persistent interrogation of his mother about a conspiracy theory involving a photograph taken of him as a baby. The dispatcher advised there would be a delayed response because the police had other priorities. At 2:18 a.m.,

James Murphy contacted law enforcement to cancel his earlier request, since appellant had by then calmed down and the family was ready to go to sleep.

Appellant's behavior worsened during the first week of August. He began to act as if his parents' home was a military installation and he was the commanding officer, claiming that he outranked his parents and thus had control over the premises. The assertion was nonsensical for a variety of reasons, not the least of which being that, in contrast to appellant's inglorious military experience, his father had achieved the rank of Major over the course of a 23-year career in the Army. Nevertheless, appellant posted a list of "rules" advising his parents of things they were forbidden from doing in their own house without his permission.

On August 8, 2013, appellant's parents secretly met with an attorney to start the process of obtaining a restraining order and having appellant removed from their home. The lawyer agreed to file the necessary paperwork, but allegedly told Mr. and Mrs. Murphy it was doubtful that a judge would rule in their favor because appellant had not physically assaulted them. Later that evening, the couple's niece, Gwenn Maher, showed James Murphy how to make video recordings on his iPhone. Together they devised a plan to surreptitiously record appellant's behavior, with the goal of being able to provide the authorities with evidence of his dangerousness. Mr. Murphy implemented the plan immediately, recording his niece as she left the house and keeping the device running while he and his wife watched television. The recording lasted for over 33 minutes, but appellant did not enter the room during that time.

On August 10, 2013, James Murphy captured video footage of appellant berating his mother for refusing to drive him to the grocery store. Mr. Murphy allowed the argument to go on for approximately seven minutes before shooting appellant with a nine-millimeter handgun, which had theretofore been concealed on or near his person. Barbara Murphy called 911 and told the dispatcher, "My husband just shot my son.… My

4.

son is crazy. He's manic depressive [and] he's off his medications." Meanwhile, appellant overpowered his father, took control of the gun, and killed him.

The Kern County District Attorney charged appellant by information with premeditated first degree murder (Pen. Code,[1] §§ 187, 189; count 1), making criminal threats against Barbara Murphy (§ 422; count 2), and committing acts of elder abuse against both of his parents (§ 368, subd. (b)(1); counts 3 & 4)). An enhancement allegation was included with the murder count for personal and intentional discharge of a firearm resulting in death (§ 12022.53, subd. (d)). Appellant pleaded not guilty to all charges, but apparently made no attempt to raise an insanity defense. The case went to trial in June 2014.

The prosecution built its case around a 28-minute video recorded on the morning of August 10, 2013. As mentioned, the subject incident was documented on an iPhone, which James Murphy had placed in an upright position behind where he was sitting when the events unfolded. The video shows Barbara Murphy, then 69 years old, lounging in a recliner located across from Mr. Murphy and to his left-hand side. The camera remains stationary during most of the recording, facing toward the interior entryway of the house, and the angle is just wide enough to show the front of Barbara Murphy's chair. She spends much of the video sitting or reclining, so viewers often see only her legs.

Barbara Murphy had promised to take appellant to the grocery store earlier that morning, but asked him to wait for one hour while she rested. The defense would later argue Mrs. Murphy had no real intention of driving him to the store, but agreed to do so knowing he would become angry and lash out when she went back on her word. In any event, the video begins with appellant's parents having a private conversation in their living room:

---

[1] Unless otherwise specified, all further statutory references are to the Penal Code.

Barbara: Do you have a plan?

James: I don't -

Barbara: How do you want to proceed on this?

James: Hmm?

Barbara: How do you want to proceed on this?

James: He's got to physically assault one of us.

Barbara: No, he doesn't.

James: Well, there's no way - other way to stop it other than when you - by calling 9-1-1, yeah. We hope.

Barbara: They –

James: They still have to get here before he does something.

Barbara: I would like you to record if you could. Alright?

James: I have it on.

Barbara: Okay. Because if they come out and he's reasonable we just look like we're stupid.

James: What?

Barbara: If we don't record something and he does not assault us we're going to look stupid if we don't have a recording to show what's going on.

Following this discussion, Mr. and Mrs. Murphy briefly chat about unrelated topics and then remain silent for nearly eight minutes. Appellant can be seen walking in and out of the room during this interval. It is apparent from the video that he is a large and physically fit man. Elsewhere in the record, appellant is described as being 6'2" and weighing between 220 and 230 pounds. James Murphy was similar in size, standing at 6'1" and weighing 206 pounds, but the age difference between father and son was more than 40 years.

Appellant's argument with his mother occurs while Barbara Murphy is seated in her recliner and appellant is standing in front of her, though he sometimes paces about the

6.

room. The following excerpts contain most of their seven-minute conversation, with slight modifications to the transcript for purposes of readability and annotations regarding the parties' respective movements. Appellant generally speaks in a conversational tone, but there are times when he suddenly screams at the top of his voice. The latter instances are denoted with capitalized type, both here and in the original transcript.

| | |
|---|---|
| Appellant: | About ready? |
| Barbara: | No. |
| Appellant: | Well, uh, you want to go? |
| Barbara: | No. |
| Appellant: | You don't want to go? |
| Barbara: | Geoff, I'm not feeling good. |
| Appellant: | Alright, so I'll just go. |
| Barbara: | You're not going to just go. |
| Appellant: | How the fuck are you going to tell me that? I want to go. And you guys can just stay here and do your thing, but I need some things that I need to take care of. |
| Barbara: | Like what? |
| Appellant: | None of your fucking business. How about the groceries? How about a couple of things? I don't have much time here. I don't. [Turns to address James Murphy] Care to weigh in dad? Father? So- |
| Barbara: | Your dad said- |
| Appellant: | -anyway- |
| Barbara | Dad said to make a list- |
| Appellant: | I['ve] got a list. You're not going to get my list. I'm going to go. So either you're up now or what. |
| Barbara: | I want to - |

Appellant:     I'm not going to sit here and do this.  This [-] you're [not a] child.
               You're older than me, okay.  You know what the fuck I'm saying,
               it's coming out [of my mouth].  We're going.  Now.  Me and you.
               …  Five minutes.

Barbara:       I'm not going to be ready.

Appellant:     Well then give me the keys 'cause I'm going.

Barbara:       No, I'm not giving you the keys.

Appellant:     Well then I'm calling the fucking police.

Barbara:       Call the police.

Appellant:     You ready for that?

Barbara:       Yeah.

Appellant:     Alright good.  Oh, that's right you guys have already tried.  Didn't,
               didn't work out did it? [Apparently referring to the 911 call made on
               July 30, 2013.]

Barbara:       Yeah, you probably aren't going to get any further than I did.

Appellant:     Oh, isn't that interesting.  You think so?

…

Appellant:     Yeah, so you about ready?

Barbara:       No.

Appellant:     [Unintelligible statement.] BITCH THIS IS A PRISON!
               [James Murphy leans forward in his chair and reaches toward the
               lower middle section of his back with his right hand.]

Barbara:       No, it's not.

Appellant      YOU DO WHAT I SAY! … Why are you being so fucking
               combative? [Voice becomes calm again.] I see you're tired [and] not
               feeling well, why don't you just give me [the] car and give me a few
               bucks and I'll go take care of it.

8.

Barbara: Geoff we had such a nice day yesterday.

Appellant: I don't give a shit. I hope it was wrecked with thoughts about how fucking terrible this can continue to be, should you continue on like this. Let's go.

Barbara: Geoff-

Appellant: GEOFF WHAT?! Let's go.

[James Murphy sits back in the chair and crosses his legs.]

Appellant: That's right, you've got an order. You want to disobey the whole fucking United States right now?

Barbara: Yeah, I'd like to see it in writing.

Appellant: [Raising his voice again] I have it in writing bitch. It's right here.

Barbara: Well go show me.

Appellant: You're not going to get anything, 'show me,' this ain't the "Show Me State!"

[Barbara Murphy finds this comment amusing.]

Appellant: Yeah, that's a good one actually.

Barbara: [Chuckles] It was quite funny. I, I don't know why you can't wait.

Appellant: Why do I need you? You fucking forgot, all you are right now is [a] goddamn checkbook.

Barbara: Well that might be-

Appellant: [Mimicking his mother] "That might be." You don't have word edgewise. You want me to shut you down totally? [Raising his voice] Shut up. You're the one I got to get through [to], Dad already gets it. He's ex-military so he knows what to do. He knows fucking better. You don't do what you're doing right now to me.

Barbara: What am I doing?

9.

Appellant: I'm giving you a fucking order bitch. That means let's get up and go. That either means when I said five minutes I'm ready to go and I saw your ass standing over here - at or –

Barbara: Excuse me.

Appellant: -or what?

Barbara: You already and I already agreed an hour.

Appellant: Well it's been an hour….

Barbara: It hasn't-

Appellant: It's 8:12 [a.m.], we're about ten minutes off. I remember it was 7:26 when we made this agreement….

…

Appellant: It's time. You're awake. You're aroused. Let's go.

Barbara: No, I'm not.

Appellant: Well then bitch you better move and give me the keys. [Raises voice] You've had enough?! Give me the keys then or we're going in five minutes…. Wipe your ass and we're going in five minutes or you give me the keys or I will fucking call the police and tell them to come here.

Barbara: Okay, call them now.

Appellant: Fuck you. I'll call them when I'm ready.
[Barbara Murphy attempts to say something and appellant interrupts her twice with nonverbal outbursts.]

Barbara: You aren't going to call [them].

Appellant: I'll stomp your ass and they won't even fucking do anything about it. You know how sick that is?

Barbara: Why would you stomp my ass?

10.

Appellant:     Because you're being a little shit.  I'm not your daddy. [Leans down toward Barbara's face] I'm [your] fucking son come HELLBOUND BITCH!

Yeah, I'm yelling at you.  I don't care if you bore me, you don't even fucking give me a real baby picture.  I know who [that is].  I remember Jason [referring to his younger brother] getting wheeled in the fucking stroller bitch.  I was three and a half [years old,] yeah.  I had memory then, remember I was talking at one!  REMEMBER BITCH? [leans closer to her face] I AM THE ANTICHRIST! FUCK YOU!

Barbara :      Geoff, please.

[Appellant begins pacing about the room, eventually moving off camera.]

Appellant:      I am the antichrist motherfucker, if you ever thought about it.

Barbara:       What exactly is-

Appellant:     SHUT UP.

Barbara:       -is the antichrist?

Appellant.     Five minutes!

Barbara:       No.

Appellant:     [Mimicking his mother] "No."  I told you this is a prison.  I got shanked right here bitch.  You ready to take me on?

[Appellant walks back into the room holding an elongated lighter in his right hand, i.e., the type of device used to light a grill or fireplace.]

Maybe I'll just knock you upside the fucking head first.  [Moves directly in front of his mother's chair and punches the air.]  YOU

11.

READY FOR THAT?! [Barbara flinches and raises her arm in a defensive posture.]

Barbara:     No.

Appellant:   [Mimicking his mother] "No."

Just like I had to fucking whine [pokes Barbara in the stomach with the lighter]. Just like that. [Swats her leg with the lighter two times.]

Barbara:     Stop hitting me!

Appellant:   Just like that.

Barbara:     Okay.

[Appellant moves approximately six steps away from Barbara and goes out of view. James Murphy repositions himself and leans forward in his chair.]

Appellant:   [Speaking to his father] Major, don't even think about it. I'll do you next. You're my favorite. [Walks back into view of the camera.]

Barbara:     Why don't you put that thing away. Don't hit me.

Appellant:   I didn't hit you.

Barbara:     You did too. You poked at me.

Appellant:   [Pacing around the room] You battered the fuck out of me as a child, [even] kicked me in the balls, so fuck you.

Barbara:     I never kicked you-

Appellant:   Fuck you I have a better memory than you. It's eidetic. E-D-E-

Barbara:     I did not kick you in the balls.

Appellant:   E-I-D-E-T-I-C, excuse me.

…

Barbara:     Don't you remember when you broke my finger?

12.

Appellant:  [Standing a few feet away from the front of his mother's chair] That was so good. You deserved it. You little bitch. You were slapping me while I was driving. Fuck you.

Barbara:  Uh, you almost-

Appellant:  Fuck you.

[At this point appellant extends his right arm and ignites the lighter. He pauses, takes a step closer, then extinguishes the flame.]

Barbara:  Stop that.

Appellant:  Fuck you.

Barbara:  Okay.

As Barbara Murphy says "okay" for the last time, appellant drops his hand to his side and starts to turn away from her. A second later, James Murphy says, "That's enough," then rises out of his chair and shoots appellant in the middle of his chest. Appellant recoils in pain and lets out a yell as James Murphy aims the gun a second time. Before he can fire another round, appellant lowers his left shoulder and charges at him, trying to wrap his right arm around his father's upper body as the two of them move off camera.

The men disappear from view at approximately 18 minutes and 28 seconds into the video. During the next 10 seconds, appellant laughs and says, "You shot me? Are you serious? Are you fucking serious motherfucker?" While this is happening, Barbara Murphy gets out of her chair, fumbles with a cordless telephone, and walks out of the house amid the sounds of a struggle. As she closes the door behind her, appellant can be heard saying, "I'm gonna kill you. I'm gonna kill you." He then asks, "How'd you get this gun?" This is followed by approximately 30 more seconds of audible combat. The viewer/listener hears the unmistakable sound of blows being landed, interspersed with grunting, heavy breathing, and further laughter on appellant's part, with statements by

13.

him that include, "Fuck you, motherfucker," a comment about his father's rolling "eyeballs," and words to the effect of, "You think you give me clearance motherfucker?"

When the video counter reaches 19 minutes and 17 seconds, appellant whispers what sounds like "Dad" or "Daddy," repeats himself a few seconds later, then raises his voice and says, "Enough. Enough's enough. Enough I said!" There is another five seconds of movement and grunting, followed by a gunshot.

Immediately after the shot is fired, appellant says, "Now you're dead." He pauses, and repeats, "Now you're dead. Told you." Appellant comes back into view about 35 seconds later. Holding the gun by its barrel, he stands in front of a mirror and lifts up his shirt to examine the bullet wound to his chest, remarking, "That ain't good." Continuing to talk out loud, appellant mutters, "He shot me. I killed him. [Unintelligible statements] Bye. Made a mistake."

Next, appellant retrieves a telephone and tries to call 911, not realizing his mother is already on the line with a dispatcher. When the dispatcher asks who is speaking, he identifies himself, says "I need you over here now," and explains that his father shot him in the chest. When asked where his father is, appellant replies, "He's on the floor." The dispatcher asks three times if appellant's father has been shot, but appellant ignores those questions. He tells the dispatcher to "hurry" before hanging up the phone. As the video draws to a close, appellant can be heard talking to himself: "… He tried to kill me. He did. I don't know if it's going to work, [but it] might."

Testimony from the pathologist who performed an autopsy on James Murphy's body revealed that a "muzzle imprint" was found on the side of the decedent's head, indicating the gun was pressed against his skin when it was fired. The bullet entered the left side of the skull, passed straight through the brain, and exited out the other side. The pathologist's testimony further confirmed, as did post-mortem photographs, that James Murphy sustained "blunt force trauma" to his head and body prior to being shot. An assortment of abrasions, contusions, and lacerations were visible throughout the face,

14.

chest, arms, and legs. The extensive bruising led the pathologist to conclude the victim had been struck multiple times prior to his death.

Since appellant was not found to have any injuries other than those related to his gunshot wounds, the prosecution argued that the fight between James Murphy and his son had been one-sided, and appellant's use of deadly force unjustified. The bullet that went through the victim's head was found lodged in a baseboard near his body, which the prosecution cited as evidence of the bullet's trajectory, the parties' respective positions at the time of the shooting, and proof of an "execution style" killing. Accordingly, the jury was urged to find appellant acted with deliberation and premeditation.

Appellant's trial counsel argued for an acquittal on grounds of perfect self-defense. The argument was presented as part of a broader theory that James and Barbara Murphy had essentially conspired to murder their son, and antagonized him in order to manufacture a justifiable homicide defense for themselves. This theory was summarized in closing argument: "[James Murphy] was waiting for Geoff to physically assault one of them. He was waiting for that right moment…. That sounds a lot like premeditation and deliberation, not from Geoff, but from his parents. They were waiting for the right moment to shoot him."

In support of its position, the defense pointed to the video created on August 8, 2013, two days prior to the victim's death. During that recording, Barbara Murphy asks her husband, "Jim, did you get the baseball bat out?" He responds affirmatively, and she inquires about its location. Defense counsel argued that "bat" was the couple's code word for gun.[2] The same video appears to show an object concealed in the back

---

[2] At trial, Barbara testified that she and her husband kept two firearms stored in an attic space over the garage, and claimed she did not know James Murphy had retrieved one of those guns until the moment he shot appellant on the morning of his death. She also explained that her husband had been sleeping with a baseball bat next to his side of the bed in case appellant tried to attack them in the middle of the night. However,

15.

waistline of James Murphy's pants, possibly a firearm, suggesting that he contemplated shooting appellant well in advance of the subject incident. The defense further noted Barbara Murphy's behavior in the moments after her son had been shot, which could fairly be interpreted as showing a lack of surprise and urgency. She had no verbal reaction to the shooting, showed the presence of mind to reach for the cordless phone almost immediately, and exited the house in an arguably casual manner.

As for the self-defense argument, counsel relied on appellant's warnings of "enough" that were issued seconds before the fatal shooting. The defense hypothesized that James Murphy retained possession of the firearm while fighting with his son and continued to struggle against him during the final moments of his life. Construing the physical evidence differently than the prosecution, counsel argued that "James was on top of Geoff and still [had] the upper hand" immediately prior to being shot.

Appellant raised an issue of diminished actuality by introducing evidence of a mental disorder in conjunction with the argument that he never formed the specific intent required for first degree murder. Luis Velosa, M.D., a retained psychiatrist, testified to appellant's affliction with bipolar disorder, which is a mental illness that can produce symptoms of depression, mania, and psychosis. Dr. Velosa opined that appellant was suffering from "bipolar disorder with psychotic symptoms" when he killed his father. We further summarize the expert's testimony in the Discussion, *post*.

The jury found appellant guilty as charged and returned a true finding on the firearm enhancement. He was sentenced to a combined term of 50 years to life in prison for the first degree murder conviction (25 years to life) and firearm enhancement (a consecutive 25-year term). The trial court imposed consecutive terms for the remaining counts, which consisted of the mitigated two-year term for count 3, a one-year term for

homicide investigators did not report finding a baseball bat during their search of the home.

count 4 (one-third of the middle term) and eight months for count 2 (same), resulting in an aggregate sentence of 53 years and eight months to life. A notice of appeal was filed on the day of sentencing.

## DISCUSSION

**Jury Instructions**

Appellant complains about the trial court's use of three jury instructions concerning the law of self-defense. The instructions were adapted from the language in CALJIC Nos. 5.55, 5.13, and 5.30, which respectively pertain to contrived self-defense, justifiable homicide in defense of oneself or another person, and the use of self-defense against an assault.[3] There are numerous subparts to appellant's arguments, but the gravamen of his claim is that the instructions were unwarranted due to a lack of evidentiary support, and giving them to the jury had a dual effect of endorsing the prosecution's position that James Murphy was initially justified in shooting appellant, and weakening appellant's own self-defense argument.

---

[3] The jury received a modified version of CALJIC No. 5.55, which read as follows: "The right of self-defense or defense of another is not available to a person who seeks quarrel with the intent to create a real or apparent necessity of exercising self-defense."

The instruction given pursuant to CALJIC No. 5.13 was modified to address a scenario involving *attempted* justifiable homicide: "Attempted [h]omicide is justifiable and not unlawful when committed by any person in the defense of himself or another if he actually and reasonably believed that the individual he attempted to kill intended to commit a forcible and atrocious crime and that there was imminent danger of that crime being accomplished. A person may act upon appearances whether the danger is real or merely apparent."

CALJIC No. 5.30 was given in its standard form: "It is lawful for a person who is being assaulted to defend himself from attack if, as a reasonable person, he has grounds for believing and does believe that bodily injury is about to be inflicted upon him. In doing so, that person may use all force and means which he believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."

17.

There is nothing in the record to indicate that appellant objected to the instructions he now challenges. The jury instruction conferences were not reported, and the clerk's transcript is devoid of any information concerning which pattern instructions were requested by each party, or whether certain instructions were proposed by both sides or given sua sponte. However, after the jury began its deliberations, the trial court made statements about certain instructions it had modified and provided the parties with an opportunity to make a record of any issues they wished to raise. No objections were made. Furthermore, although appellant highlights the prosecution's reliance on the contrived self-defense instruction, we note defense counsel cited and quoted the same instruction during closing argument to underscore the theory that appellant's parents were the ones who attempted to manufacture a need for self-defense.

The Attorney General rightfully contends that all claims of instructional error have been forfeited. Failure to object to a jury instruction forfeits the claim on appeal. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1260.) In his reply brief, appellant cites to authorities that address circumstances under which an appellate court may consider forfeited claims on their merits, apparently inviting us to exercise such discretion in this instance. We decline to do so.

**Limitation of Expert Witness Testimony**

During a break in the expert testimony of Dr. Velosa, the trial court heard arguments regarding a previously overruled objection to a question and answer given by the witness on direct examination. Upon further consideration, the court struck the challenged testimony. Appellant claims this decision was erroneous and ultimately swayed the jury's verdict on the issues of malice and premeditation. We need not determine the propriety of the trial court's ruling since the alleged error was harmless under any standard of prejudice.

Background

       Dr. Velosa's trial testimony provided a summary of what bipolar disorder is and how the condition manifests itself. In his words, it is "a major psychiatric illness" caused by an absence or disturbance of neurotransmitters, which are chemicals in the human brain. The resulting chemical imbalance produces symptoms that can include mood swings ranging from extreme depression to extreme mania, hence the formerly used labels of manic depression and "manic depressive illness." The more acute the chemical imbalance, the more severe the symptoms may be; the worst sufferers can experience racing thoughts, intense agitation, paranoia, delusional beliefs, and psychosis.

       In forming his expert opinions, Dr. Velosa reviewed and relied upon appellant's medical records; watched the August 10, 2013 video of appellant interacting with his parents; and evaluated appellant in person on November 22, 2013 and again on June 18, 2014, approximately two weeks prior to his trial appearance. He diagnosed appellant as suffering from "bipolar disorder with psychotic symptoms," meaning "the extreme level of bipolar disorder where the person gets so impaired that he start[s] developing psychotic symptoms." Those symptoms were in remission at the time of Dr. Velosa's face-to-face evaluations because appellant's condition had been stabilized through a regimen of antipsychotic, antidepressant, and antianxiety medications administered to him while he was in custody.

       The expert was asked to provide opinions regarding appellant's mental health in August 2013 based on a review of the video footage and the list of rules appellant had posted in his parents' home. Speaking to the latter item, Dr. Velosa said, "[T]his particular document written by the defendant is sort of a classic document of a person who is suffering from paranoi[a] and delusions and ideas of grandiosity," all of which are characteristic of bipolar disorder. After being asked to make a diagnosis based on appellant's behavior toward his mother, the expert testified as follows: "[The] best way to answer this question would be it confirmed visually my clinical opinions that the

19.

defendant at the time of the alleged offense was suffering from a psychiatric disorder classified as a bipolar disorder with psychotic symptoms. It confirmed it. … And I must say that his whole behavior was so psychotic. Every single – I mean, the way he approached the whole situation. The way that he was treating his parents. The barbecue lighter. The things that he was saying [were] totally psychotic."

Appellant's claim on appeal is based on a subsequent exchange between Dr. Velosa and defense counsel:

Dr. Velosa: The visual part, there's no question in my mind the defendant was under some sort of a grandiose, paranoid delusion[] extremely, which is part of the psychotic symptoms. The anger, the type of situation. [She's] defying the United States government just because he doesn't go [to] a grocery store.

Counsel: And the agitation as well?

Dr. Velosa: That's what is psychotic about it. Yes.

Counsel: Can bipolar disorder lead to impulsive behavior?

Dr. Velosa: Yes.

…

Counsel: Are people who are – are people who are experiencing a manic episode more impulsive than normal, for example?

Dr. Velosa: I would qualify [that] in our terminology we have impulsivity and we have agitation, which is the highest level of impulsivity. When a person is agitated that's what perhaps is not just impulsive. [The] person is thoroughly agitated. Whatever the person is doing at that level. That's not any reflection of what - of – it just explodes. Just do it without any reflection for the consequences or anything like that. And that's the agitative level. That's why we have, unfortunately, psychiatric hospitals. Because when the person

20.

comes to that level of agitation, not just plain impulsivity, they need to be in a psychiatric unit.

Counsel: And would it be fair to describe the behavior that Geoff – the interaction with Geoff and his mother, could that be impulsive?

Prosecutor: I'm gonna object. That's asking the ultimate question of fact.

Trial Court: Overruled. You may answer.

…

Dr. Velosa: The highest of the impulsive level, the agitated behavior, indeed.

The prosecution later renewed its challenge to the admissibility of the final answer in the above-quoted exchange. Before the court heard argument on that issue, defense counsel elicited additional testimony relating to the question of deliberation and premeditation. Counsel asked, "On August 10th of last year, from the video that you saw… Is it possible that Geoff planned his conduct?" Dr. Velosa replied "No." The expert was then asked if appellant's bipolar disorder, as evident from the video, affected his reasoning. Dr. Velosa's response was "Yes."

The prosecution argued that Dr. Velosa's testimony regarding appellant's level of impulsivity was tantamount to an opinion regarding whether appellant acted with the mental state required for first degree murder. The trial court was not entirely persuaded by this argument, but nevertheless decided to strike the challenged testimony and allow defense counsel to rephrase her original question. The jury was admonished as follows: "I am striking part of the witness's testimony from this morning's session. The witness had testified about his opinion as to whether the defendant was acting impulsively at the time of the incident that's depicted in the video involving he and his mother. The witness did express an opinion that the defendant was acting at the highest level of impulsive behavior with his mother. I'm striking that testimony, which means you must disregard it and treat it as if it had not been spoken."

Following the admonishment, defense counsel successfully elicited the following testimony:

Counsel: During the video when Geoff was yelling profanities at his mother in her face, was that an episode of manic bipolar disorder?

Dr. Velosa: Yes.

Counsel: When - during the video when Geoff had the lighter in his mother's face was that also an example of manic episode of bipolar disorder?

Dr. Velosa: Yes.

Counsel: Does the fact that someone has bipolar disorder manic episode, does that have significant impact on someone's thought process?

Dr. Velosa: Yes.

Counsel: And does that affect their ability to plan?

Dr. Velosa: Yes.

Counsel: Hypothetically speaking, if someone gets shot and then after that they are laughing and giggling, is that an example of a psychotic or manic episode?

Dr. Velosa: It is definitely an abnormal reaction after such a serious traumatic event. Whether it is psychotic in nature or manic in nature I'm not – it's thoroughly unusual.

Counsel: Okay. The encounter between Geoff and his mother – the encounter between Geoff and his parents, could that result – could it result in an impulsive reaction from Geoff's mental condition?

Dr. Velosa: Yes.

…

Counsel: Just to – just to clarify – just to be more specific, someone – and correct me if I'm wrong. Someone who is psychotic is rational or not rational?

22.

Dr. Velosa:   Irrational.  Irrational.

Analysis

Because appellant did not raise an insanity defense, there was (and is) a conclusive presumption of his mental capacity to commit the crimes for which he was convicted. (§ 1016, subd. 6; *People v. Elmore* (2014) 59 Cal.4th 121, 141, fn. 12. (*Elmore*).)  He chose to present arguments concerning the distinct concept of "diminished actuality," which is a term used to describe the limited defense authorized by section 28.  "This provision states that evidence of mental disorders is admissible 'on the issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged' … [Citation.] Section 28(a) bars evidence of the defendant's *capacity* to form a required mental state, consistent with the abolition of the diminished capacity defense."  (*Elmore*, *supra*, 59 Cal.4th at p. 139, original italics, fn. omitted.)

Section 28, subdivision (d) provides: "Nothing in this section shall limit a court's discretion, pursuant to the Evidence Code, to exclude psychiatric or psychological evidence on whether the accused had a mental disease, mental defect, or mental disorder at the time of the alleged offense."  A related statute, section 29, circumscribes the permissible scope of expert testimony in support of a diminished actuality defense.[4] Simply put, the expert cannot express an opinion as to whether the defendant had the mental state required for the charged offense at the time of its commission.  (*People v. Mills* (2012) 55 Cal.4th 663, 672, fn. 4.)

---

[4] "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact."  (§ 29.)

23.

"A trial court's decision to admit or exclude evidence is reviewable for abuse of discretion." (*People v. Vieira* (2005) 35 Cal.4th 264, 292.) This standard applies to a ruling on the admissibility of expert testimony under section 29. (*People v. Pearson* (2013) 56 Cal.4th 393, 443-444 (*Pearson*).) The improper exclusion of expert testimony is an error of state law and subject to the test for prejudice set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*). (See *People v. Jones* (2012) 54 Cal.4th 1, 63, 67-68.) Appellant alleges that the trial court's ruling implicated his constitutional right to present a defense, but case law holds otherwise: "Where a trial court's erroneous ruling is not a refusal to allow a defendant to present a defense, but only rejects certain evidence concerning the defense, the error is nonconstitutional and is analyzed for prejudice under *Watson*, *supra*, 46 Cal.2d 818—i.e., the judgment should be reversed only if it is reasonably probable that the defendant would have obtained a more favorable result absent the error." (*People v. Garcia* (2008) 160 Cal.App.4th 124, 133.)

Respondent aptly directs our attention to *People v. Breaux* (1991) 1 Cal.4th 281, where the California Supreme Court disposed of a similar claim for lack of prejudice "[w]ithout deciding whether the psychiatrist's testimony fell within the proscription of section 29." (*Id.* at p. 303.) Frankly, we fail to see how the trial court's ruling could be construed as having diminished the import of Dr. Velosa's testimony. The expert testified that appellant suffered from bipolar disorder and was in the throes of a psychotic episode attributable to his mental illness at the time of the offense. Dr. Velosa's testimony clearly conveyed the opinion that appellant's symptoms would have impaired his ability to form rational thoughts or engage in meaningful reflection and deliberation. That opinion is supported by the video footage, which was the most compelling piece of evidence in the case. If a combination of the expert's insights and visual proof of appellant's mental instability was not enough to move the jurors to return a verdict of something less than premeditated murder, it is hard to imagine what else Dr. Velosa could have said to change their minds. We are confident, however, that the jury would

24.

have undoubtedly returned the same verdict had the challenged testimony not been stricken.

**Sufficiency of the Evidence**

Standard of Review

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Jurado* (2006) 38 Cal.4th 72, 118.) The standard of review is "highly deferential" to the jury's verdict. (*People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538.) It is the jury, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. This means if the evidence can reasonably be interpreted in more than one way, the appellate court cannot substitute its own conclusions for those of the trier of fact. (*People v. Millwee* (1998) 18 Cal.4th 96, 132.) In other words, "reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Count 1

Appellant disputes the sufficiency of the evidence of deliberation and premeditation in connection with the verdict of first degree murder. His arguments focus on the lack of proof regarding planning activity and/or a motive to kill for reasons other than self-defense. He further maintains that the evidence of "his judgment [being] clouded by severe mental illness" necessarily raised a reasonable doubt about his mens rea.

As a brief aside, we recognize that for many people the facts of this case will beg the question of how appellant could have been convicted of any crime greater than heat of passion manslaughter. The applicable law is summarized in *People v. Beltran* (2013)

25.

56 Cal.4th 935: "Heat of passion is a mental state that precludes the formation of malice and reduces an unlawful killing from murder to manslaughter. Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of *unconsidered reaction to the provocation*. While some measure of thought is required to form either an intent to kill or a conscious disregard for human life, a person who *acts without reflection in response to adequate provocation* does not act with malice." (*Id*. at p. 942, fn. omitted, italics added.)

Being intentionally shot in the chest by anyone, much less your own father, surely constitutes adequate provocation for purposes of a heat of passion analysis. However, "[i]t is not enough that provocation alone be demonstrated." (*People v. Sinclair* (1998) 64 Cal.App.4th 1012, 1015.) The jury must also be convinced that the defendant's ability to reason was in fact obscured by passion at the time of the killing. (*Ibid*.) " '[I]f sufficient time has elapsed between the provocation and the fatal blow for passion to subside and reason to return, the killing is not voluntary manslaughter … .' " (*People v. Breverman* (1998) 19 Cal.4th 142, 163.) The jury in this case may have accepted that appellant was provoked, but obviously believed he kept or regained the mental fortitude to refrain from killing his father.

The issue on appeal is not the presence or absence of provocation, but whether appellant deliberated and premeditated before firing the gun. Premeditation "encompasses the idea that a defendant thought about or considered the act beforehand." (*Pearson*, *supra*, 56 Cal.4th at p. 443.) Deliberation " ' "refers to careful weighing of considerations in forming a course of action." ' " (*Ibid*.) " 'Premeditation and deliberation can occur in a brief interval. "The test is not time, but reflection. 'Thoughts

may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " ' " (*People v. Sanchez* (2001) 26 Cal.4th 834, 849.)

The case law is replete with examples of deliberation and premeditation occurring during a short period of time. In *People v. Mayfield* (1997) 14 Cal.4th 668,[5] where the defendant wrested a gun from a police officer and shot the officer in the head during a brief altercation, it was held that "a rational trier of fact could conclude from the evidence that before shooting [the officer] defendant had made a cold and calculated decision to take [his] life after weighing considerations for and against." (*Id*. at pp. 767-768.) Likewise, in *People v. Mendoza* (2011) 52 Cal.4th 1056 (*Mendoza*), the high court found sufficient evidence of premeditation under circumstances where the defendant killed his victim within a few minutes of their initial encounter. (*Id*. at p. 1069-1074.) The *Mendoza* opinion also notes that a single gunshot to the head can support the inference of a deliberate intent to kill. (*Id*. at p. 1071.)

Appellant's arguments purport to rely on *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), which identifies three categories of evidence that are probative of deliberation and premeditation: proof of planning, motive, and the manner of killing. (*Id*. at pp. 26-27.) However, "[t]hese three categories are merely a framework for appellate review; they need not be present in some special combination or afforded special weight, nor are they exhaustive." (*People v. Booker* (2011) 51 Cal.4th 141, 173.) Although not required to sustain the conviction, the record before us contains substantial evidence under each of three *Anderson* categories.

"[A] killing resulting from preexisting reflection, of any duration, is readily distinguishable from a killing based on unconsidered or rash impulse." (*People v. Solomon* (2010) 49 Cal.4th 792, 813.) The most probative evidence of premeditation is

[5] Disapproved on another ground as stated in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2.

27.

found at approximately 18 minutes and 37 seconds into the August 10, 2013 video, when appellant says, "I'm gonna kill you. I'm gonna kill you." These words show that he "thought about or considered the act beforehand." (*Pearson*, *supra*, 56 Cal.4th at p. 443; *People v. Steele* (2002) 27 Cal.4th 1230, 1250 [defendant's statement of "Put the phone down or I'll kill you" was evidence of planning].) He does not shoot his father until nearly a minute later, when the video counter reaches 19 minutes and 33 seconds. In the interim, at 18 minutes and 40 seconds, appellant asks, "How did you get this gun?" The jury may have interpreted this question as indicating appellant had disarmed his father by that point in time, thus supporting its conclusion that the use of lethal force was unnecessary and gratuitous.

There was testimonial and photographic evidence which showed the victim was pummeled prior to being shot. Beginning at 18 minutes and 54 seconds into the video, the viewer hears at least four heavy blows being landed, with one of the impacts punctuated by appellant's statement of "Fuck you." This is followed by the distinct sound of appellant spitting, and one can't help but assume he is projecting saliva at his father. The audio paints a vivid picture in the mind's eye, which for the jury was the image of a man acting with cold, calculated malice. A full 33 seconds pass from that point until the moment when the fatal shot is fired.

Appellant insists there could have been no motive for killing his father other than self-defense. This argument ignores the obvious possibility of revenge, considering the victim had just tried to kill *him*. Incidentally, acting out of a passion for revenge does not reduce the crime of murder to manslaughter. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144; *People v. Williams* (1995) 40 Cal.App.4th 446, 453.)

In terms of how the crime was committed, appellant submits that "the manner of killing was not particular or exacting." He then contrasts the facts of this case with those in *People v. Nazeri* (2010) 187 Cal.App.4th 1101, where the defendant killed his wife and mother-in-law by stabbing each of them more than 20 times with a knife. (*Id*. at pp.

1103-1104.) The comparison is not helpful. Here we are concerned with evidence of an execution-style killing, i.e., death by a bullet fired from a gun placed directly against the victim's head. (*People v. Bloyd* (1987) 43 Cal.3d 333, 348.) A killing of this nature is generally viewed as the quintessential example of deliberation and premeditation, albeit more so in cases where there is no evidence of a prior struggle. (*Ibid*; *People v. Romero* (2008) 44 Cal.4th 386, 401.) As stated in *People v. Lenart* (2004) 32 Cal.4th 1107, 1127, "an execution-style killing may be committed with such calculation that the manner of killing will support a jury finding of premeditation and deliberation, despite little or no evidence of planning and motive."

Proof of appellant's mental illness does not override the evidence of planning and reflection. Although Dr. Velosa's testimony strongly supported a diminished actuality defense, the jurors were not required to accept his testimony as true or conclusive. (§ 1127b.) A jury "may disregard the expert's opinion, even if uncontradicted, and draw its own inferences from the facts." (*Kennemur v. State of California* (1982) 133 Cal.App.3d 907, 923; accord, *People v. Perez* (1992) 4 Cal.App.4th 893, 900 ["A jury is not required to accept the testimony of an expert witness even if he or she is the sole expert testifying at trial."].)

In summary, twelve jurors came to the unanimous conclusion that appellant thought about what he was doing before he killed his father, and was able to reflect upon his actions despite having symptoms of mental illness and a reason to feel provoked by what the victim had done to him. A different jury might have interpreted the facts another way, but the record does contain sufficient evidence of deliberation and premeditation. We must therefore affirm the conviction of first degree murder.

Count 2

In his final argument, appellant claims there is insufficient evidence that he made criminal threats against his mother. He acknowledges issuing threats of bodily harm, but characterizes those statements as mere "emotional outbursts." His argument is untenable.

29.

Section 422 makes it a crime to "willfully threaten[] to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement … is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety . . . ."  (§ 422, subd. (a).)  The statute "was not enacted to punish emotional outbursts[;] it targets only those who try to instill fear in others."  (*People v. Felix* (2001) 92 Cal.App.4th 905, 913.)  Appellant attempts to connect the latter principle to the argument that he did not intend to "inflict serious evil on his parents."  However, the intent to carry out a threat is not an element of the offense.  (*People v. Butler* (2000) 85 Cal.App.4th 745, 759.)

Appellant's statements to his 69-year-old mother included threats to "shut [her] down totally," "stomp [her] ass," and "knock [her] upside the fucking head."  The threats were issued in the context of him demanding to be driven to the grocery store.  The jury could have reasonably concluded appellant intended for his statements to be taken seriously and instill fear in his mother, thereby motivating her to comply with his demands.  As so construed, the evidence is sufficient to support a conviction under section 422.

## **DISPOSITION**

The judgment is affirmed.

_____
GOMES, J.

WE CONCUR:


_____
HILL, P.J.


_____
KANE, J.

31.